General Electric Co. v. Director of the Division of Employment Security.

GENERAL ELECTRIC COMPANY vs. DIRECTOR OF THE
DIVISION OF EMPLOYMENT SECURITY & others
(and a companion case; see fn. 1).

Essex.    April 8, 1965. — May 4, 1965.

Present: WHITTEMORE, CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Employment Security,* Vacation pay, Unemployment, Remuneration.
*Words,* "Entitled."

Where, pursuant to a collective bargaining agreement between an em-
ployer and a labor union, the employer's plant was shut down and no
work was provided during a period in July "for vacation purposes,"
and under the agreement employees who were not eligible for vacation
pay at the time of the vacation period but became eligible later in
the year after returning to work were entitled to receive vacation pay
at the times of eligibility, vacation pay so received later in the year
by certain employees who then became eligible might "reasonably be
considered to apply" to the vacation period within G. L. c. 151A,
§ 1 (r) (3), as amended through St. 1957, c. 632 [213]; but as of
the date of the shutdown of the plant, the proper date for determina-
tion of the question whether such employees were "entitled" to vacation
pay within § 1 (r) (2), as amended through St. 1951, c. 763, § 1, such
employees' rights to vacation pay were uncertain and contingent and
they were not then so "entitled," and a decision that they "were in un-
employment" in the vacation period and entitled to benefits under
c. 151A was correct [208, 213].

PETITIONS filed in the District Court of Southern Essex
on December 17, 1962, for review of decisions of the board
of review in the Division of Employment Security.

The cases were heard by *Landergan,* J.

*Laurence S. Fordham* for General Electric Company.

*Joseph S. Ayoub,* Assistant Attorney General (*Israel L.
Cohen* with him), for the Director of the Division of Em-
ployment Security.

*Warren H. Pyle* for Robert A. Snow & another.

CUTTER, J.    These claimants for unemployment benefits

under G. L. c. 151A were employees of General Electric Company. The plant in which the claimants were employed was "shut down during the weeks ending July 21 and July 28, 1962, for vacation purposes," pursuant to the applicable collective bargaining agreement between the claimants' union and the company. No work was provided for the claimants during these two weeks. Under the collective bargaining agreement, "an employee receives any vacation pay for which he is [then] eligible at the time of the vacation shutdown. An individual is eligible for vacation pay at the completion of one year of continuous service. If he is not eligible for vacation pay at the time of the vacation closing, but becomes eligible during the latter half of the year, he will be given vacation pay when he completes his year of service. Each of the . . . [claimants] would [have] become eligible for vacation pay at later dates during 1962."

All but one of the claimants had less than one year's continuous service at the time of the regular vacation period. That employee (one Snow) was entitled to one week's vacation pay when the plant closed, which then was paid to him.

A review examiner, in behalf of the director, found on August 22, 1962 (and on September 17, 1962, with respect to Snow), that the claimants "were in unemployment" during the period of closing and were entitled to waiting period credit and benefits for the two weeks (except for Snow who was found by another examiner to be so entitled for one week). The board of review (on November 27 and 29, 1962) sustained the review examiners' decisions. The company filed in the District Court petitions for review, and thereafter claimed appeals to this court from decisions of the District Court affirming the review board's decisions. The cases are before us upon reports by the judge of the District Court. From those reports it appears that all the claimants returned to work after the vacation shutdown and that each claimant, except Snow and one salaried employee, upon the anniversary date of his employment re-

349 Mass. 207                                      209

General Electric Co. *v.* Director of the Division of Employment Security.

ceived vacation pay for one week.[1]  These anniversary dates occurred between August 8 and December 26, 1962.

The review board decided that "any vacation pay received by the claimants subsequent to the closing of the plant is not remuneration that can be applied to the vacation shutdown weeks within the meaning of" G. L. c. 151A, § 1 (r) (3).  "Therefore, it is also found that they were in total unemployment during the weeks in issue within the meaning of" § 1 (r) (2).  The relevant statutes are set out in the margin.[2]  The company, however, contends that the vacation pay disbursed to each claimant at some time after the two week vacation period was "consideration . . . as payment for vacation allowance during a period of regular employment" and that it "can reasonably be considered to apply" to the two weeks of vacation period within § 1 (r) (2) and (3).

---

[1] Snow, who is the employee involved in the companion case, in accordance with the collective bargaining agreement, received on November 28, 1962, vacation pay for one extra day upon the completion of his second year of employment.  One salaried employee upon completion of her first year of employment received vacation pay for two weeks to which she then became entitled.  The case is discussed hereafter only with respect to the other claimants.  The same principles in general are applicable to Snow's one week of unemployment and the salaried employee's two weeks of unemployment.

[2] General Laws c. 151A, § 23 (a), as amended through St. 1955, c. 530, reads, "An individual who is in total . . . unemployment . . . shall be eligible for benefits for unemployment subsequent to a waiting period . . . .  Said waiting period shall consist of one week of total . . . unemployment.  No benefits shall be . . . payable during said waiting period; thereafter benefits shall be payable weekly . . . ."  Chapter 151A, in § 1, sets out definitions.  Section 1 (r) (2), as amended through St. 1951, c. 763, § 1, reads, " 'Total unemployment,' an individual shall be deemed to be in total unemployment in any week *in which he performs no wage-earning services whatever, and for which he receives no remuneration,* and in which, though capable of and available for work, he is unable to obtain any suitable work. . . .  An individual who is not entitled to vacation pay from his employer shall be deemed to be in total unemployment during the entire period of any general closing of his employer's place of business for vacation purposes, notwithstanding his prior assent, direct or indirect, to the establishment of such vacation period by his employer" (emphasis supplied).  Section 1 (r) (3), as amended through St. 1957, c. 632, reads, "For the purpose of this subsection, 'Remuneration,' any consideration, whether paid directly or indirectly . . . received by an individual (1) from his employing unit for services . . . and (3) as payment . . . for vacation allowance during a period of regular employment.  Remuneration shall be deemed to have been received in such week or weeks in which it was earned *or for such week or weeks, including any fractions thereof, to which it can reasonably be considered to apply.*  If the length of the period to which the remuneration applies is not clearly identified, such period shall be determined by dividing such remuneration by the amount of the individual's average weekly wage" (emphasis supplied).

The relevant statutes are far from clear on the points at issue. Certainly, the "vacation" payments, once the employee becomes eligible to receive them, seem to be intended as compensation for time spent in vacation. The period of the shutdown was the period prior to the actual "vacation" payment (on the anniversary of employment) most clearly to be regarded as spent on vacation by these claimants. There is undoubtedly some atmosphere of duplicated compensation for the shutdown period, if an employee receives unemployment benefits at the time of the shutdown and later receives "vacation pay" at not less than his full weekly rate at the end of his first year of employment. These considerations, however, are not necessarily conclusive.

The director, in his brief, lays emphasis upon c. 151A, §§ 38 and 39,[3] which, he contends "emphasize the mandate of the Legislature for a prompt determination of claims." At the time of a shutdown, in circumstances such as those here disclosed, he says "it is irrelevant that the claimant *may* receive a sum of money at some future date, contingent upon his continuing his relationship with the employer, and that there be no intervention of death, illness, layoffs . . . or other unforeseen circumstances which would terminate his employment." There can be no doubt that the "vacation pay" was not available to these employees to meet the living expenses of their families when the plant was shut down. They then had merely a form of expectant interest, which would cease to be contingent only at the end of the first year of employment.

The purpose of c. 151A is obviously "to afford relief to those . . . [covered by the statute] when they are thrown out of work through no fault of their own," and is to "be construed liberally in aid of its purpose . . . to lighten the

---

[3] These sections (as amended through St. 1951, c. 763, §§ 15 and 16, respectively) refer to various requirements of prompt action by the employer and the director. Section 39 provides, in part, that the "director . . . shall *promptly* determine . . . after making such . . . investigations as he deems necessary, whether . . . a claim is valid, and the amount, if any, of the benefits payable . . . and shall promptly give notice of such determination . . ." (emphasis supplied).

349 Mass. 207    211

General Electric Co. *v.* Director of the Division of Employment Security.

burden which now falls on the unemployed worker and his family." See c. 151A, § 74 (as amended through St. 1949, c. 290); *Howes Bros. Co.* v. *Unemployment Compensation Commn.* 296 Mass. 275, 282; *Worcester Telegram Publishing Co. Inc.* v. *Director of the Div. of Employment Security,* 347 Mass. 505, 512, note, 78 Harv. L. Rev. 1273, 1274. That purpose might in some degree be thwarted, of course, if a first year employee should be denied benefits because of his expectancy of vacation pay.

No Massachusetts case under c. 151A involving vacation pay has presented precisely the problem now before us. In *Moen* v. *Director of the Div. of Employment Security,* 324 Mass. 246, 250, the provisions of a collective bargaining agreement concerning vacation shutdowns were held to be binding upon each of the represented employees, so that one, not entitled to vacation pay under that bargaining agreement, was treated as voluntarily out of work under the statute, and, therefore, not entitled to benefits. In other States, on such facts, varying results have been reached. See *Teichler* v. *Curtiss-Wright Corp.* 24 N. J. 585, 588–591, and cases there collected; annotation, 30 A. L. R. 2d 366. In any event, since the *Moen* decision, by St. 1949, c. 476,[4] there has been added to § 1 (r) (2) what is now its last sentence (see fn. 2). This amendment materially affected the rule stated in the *Moen* case, by providing that an "individual . . . not *entitled* to vacation pay . . . shall be deemed to be in total unemployment" (emphasis supplied) during any vacation plant shutdown. The *Moen* case, of course, did not pass upon the meaning of the word "entitled" in the amendment.

---

[4] This was based on 1949 House Bill No. 1349. A brief refers to a letter from the then director dated June 1, 1949, to the House Ways & Means Committee (found with the papers on the original bill in the State Archives), which states, "House [No.] 1349 would make it possible for the [d]ivision to pay benefits . . . during a recognized vacation period . . . [provided] the . . . [claimant] did not receive vacation allowance from his employer." This statement, like the last sentence of § 1 (r) (2), may leave the intention behind the amendment somewhat ambiguous, because it does not specify the time of the receipt of the vacation allowance. If properly to be considered as a part of the legislative history, the letter helps little in the present situation.

212                                                349 Mass. 207

General Electric Co. *v.* Director of the Division of Employment Security.

In *Cerce* v. *Director of the Div. of Employment Security,* 333 Mass. 130, this court sustained the action of the director in applying accrued vacation pay to the period immediately following the termination of an employee's employment, where, under the applicable collective bargaining agreement, the employee was to be paid such accrued vacation pay at the termination of the employment. This vacation pay thus was treated as "remuneration" (see fn. 2) under § 1 (r) (3) applicable to the period following the end of employment. A generally similar result was reached in *Kalen* v. *Director of the Div. of Employment Security,* 334 Mass. 503, 505–506. In the *Cerce* and *Kalen* cases, the accrued vacation allowance was, of course, absolutely payable at the termination of the employment. The allowance was reasonably treated essentially as dismissal pay which would naturally be applicable to the period following dismissal. The cases are distinguishable from the present case in that there was no element of contingency about the dismissal payments in the earlier cases when the dismissals created a situation of unemployment.[5]

The company has relied greatly upon *Texas Employment Commn.* v. *International Union of Elec. Radio & Mach. Workers,* 163 Texas, 135. This case also involved General Electric Company, the same or a similar bargaining contract, a closely comparable statute, and circumstances generally like those now presented. The Texas court concluded (at pp. 141–143) that the vacation pay, when eventually paid, constituted "wages paid with respect to the vacation-shutdown period" so that "during such time . . . [the employees] were not totally unemployed." A lower court judgment awarding benefits was reversed. No other case has come to our attention which so squarely deals with the precise issue before us.

---

[5] In *Campbell Soup Co.* v. *Board of Review,* 20 N. J. Super. 80, 82–84, retroactive application of vacation pay (agreed upon in August with a union) to an earlier period of plant shutdown (in June and July) was held improper. Other decisions involving vacation pay include two decisions somewhat like the *Cerce* case, *Jones* v. *Employment Stabilization Commn.* 120 Cal. App. 2d 770, 772–777, and *Carter* v. *Board of Review,* 323 P. 2d 362 (Okla.). See also *Valeo* v. *J. I. Case Co.* 18 Wis. 2d 578.

Our decision, however, must rest on interpretation of our own somewhat ambiguous statutes (fn. 2). We must determine whether these claimants were in total unemployment under § 1 (r) (2) in the shutdown weeks because they received no remuneration in those weeks although later in 1962 they received a week of vacation pay. As bearing upon this issue we refer to the most directly relevant statutory provisions. (1) To be in total unemployment § 1 (r) (2) requires that the "week" be one "for which . . . [the employee] receives no remuneration." (2) Under § 1 (r) (2) an employee in unemployment is an "individual who is not *entitled* to vacation pay from his employer" (emphasis supplied). That receipt of that pay remained contingent at the time of plant shutdown may be of importance. (3) Under § 1 (r) (3) the "vacation" pay actually received by the claimants must be remuneration which may "reasonably be considered to apply" to the vacation shutdown period.

We think that the contingent vacation pay was intended by the parties to be applicable to the period of the plant's vacation shutdown. Doubtless, that shutdown was arranged for reasons of plant efficiency and for the benefit of the company. Yet all the facts strongly support a conclusion that the contingent vacation pay of first year employees was as much applicable to (and given, when given, because of) the vacation shutdown period as was that of older employees who took their vacation then.

A more difficult question, however, arises with respect to whether each claimant was "entitled" to the vacation pay he later received. We think that the purpose of c. 151A, to bring about substantially contemporaneous benefits for persons who become unemployed, requires that this matter, in the first instance at least, be determined as of the date of the shutdown. Because for each claimant the ultimate receipt of vacation pay in respect of the shutdown period was then uncertain and contingent, we think the employees were not then "entitled" to vacation pay. Accordingly, on the record before the director, when he first acted, the decisions were correct.

No question is presently before us concerning whether, upon actual payment to the claimants of their vacation pay, a redetermination of their right to benefits may be made under c. 151A, § 71.[6]  We see no occasion for deciding that question now in the absence of any administrative action, or failure to act under § 71.[7]

The decisions of the District Court affirming the decisions of the board of review are affirmed.

*So ordered.*

---

[6] Section 71, as amended through St. 1951, c. 763, § 21, reads in part, "The director may reconsider a determination whenever he finds that (1) an error has occurred in connection therewith; or (2) wages of the claimant pertinent to such determination but not considered in connection therewith have been newly discovered; . . . provided, however, that with respect to (1) and (2) no such redetermination shall be made after one year from the date of the original determination . . . ."

[7] The matter, perhaps, could be dealt with appropriately in some revision of the collective bargaining agreement, as, for example, (a) by providing for a partial advance payment of vacation pay during the vacation shutdown, with the balance of such pay to be distributed later, or (b) by reducing the later payment by the amount of unemployment benefits paid earlier.  Also further legislation may clarify whether a later adjustment in such circumstances is intended.